Oral argument not to exceed 15 minutes per side. Mr. Murray for the appellants when ready. You may approach. I vote your honors. You certainly may. Have you reserved time for rebuttal counsel? Well good morning your honors. May it please the court. I'd like to reserve five minutes for rebuttal please. Alright you may proceed. I'm James W. Murray and with Tom Murray and Brent Keaton of Tennessee we represent the appellants in this matter Aaron and Lynetta Hill who lost their only children, seven year old twin sons due to a tragic runaway throttle incident on December 31st of 2015 in Winchester, Tennessee. As extensively briefed, this appeal is based on several significant prejudicial errors on which the trial court's summary judgment ruling is based. Counsel let me ask you, your arguments, are you raising the same issues as are raised in the Parks case which comes next in our document? They are. Have you all made any attempt to allocate certain people doing certain issues versus other issues? Or are you both going to be arguing the same issues? We have Judge Bush. There are some differences obviously. The Parks case is involving the driver, Mary Parks. I represent the family that was actually struck by the runaway Kia. But we have discussed and attempted to do that for the efficiency of the presentations today. The appellants state that the district court erred by finding, even in light most favorable to the plaintiffs, that there was no direct or circumstantial evidence due to the fatal crash that was caused by a specific electronic failure with the subject 2008 Kia Optima sedan driven by Mary Parks. We believe the court misconstrued the law and overlooked the significant material facts. Substantial material evidence is in the record. Several independent witnesses saw this car weaving in and out of traffic, deliberately trying to avoid the cars in the way. The lights were flashing which people took as they were trying to inform them that there was an emergency and something was going on. The car was videotaped at the crash scene from a security camera and it has been estimated that the car was traveling over 92 miles an hour. That's over three times the posted speed limit of 30 miles per hour. This Kia is believed to have traveled over 3,000 feet from its intended destination, which was going to stop at a Kroger grocery store to get milk, to the crash site. That's over 8 football fields in length. So the duration and distance of this accident is very important, particularly for accident reconstruction and looking at the human factors. The undisputed pre-crash vehicle behavior is both direct and circumstantial evidence of failure in the Kia Optima, as stated in the Browder case with the Tennessee Supreme Court. Do you agree that there needs to be a specific defect in the Optima that caused the acceleration? There has to be a defect shown, Your Honor, and I believe both through our briefing and from our argument today, we will show the elements that we believe we have met the defect standard, particularly in the Browder. What is the specific defect according to the plaintiffs? The plaintiffs believe there is a flaw, a known flaw, with what's called the electronic throttle control system. So this car actually has an electronic throttle mechanism, not a cable like the cars of a few decades ago. This electronic throttle control system lacked something called a brake throttle override, which is now pretty much standard in every vehicle. Back in 2012, the U.S. Department of Transportation and the federal government basically put forth proposed standards to make brake throttle override permanent and mandatory, but did not. But they made that decision and put that forth to the auto industry to resolve that themselves due to the Toyota unintended acceleration problem and the challenges that they were seeing nationally with those vehicles. Well, if you needed an override or a throttle control, in addition to needing that device to mitigate a sudden acceleration, wouldn't there have had to have been an underlying defect to create the acceleration in the first place, separate and apart from the issue of this electronic throttle control system? Yes. The underlying defect that was investigated by our experts, we had four liability experts look at a number of research, both the extensive documentation. We received tens of thousands of pages of engineering documents, predesigned planning, as well as things like consumer complaints, tech line complaints, warranty claims. We reviewed that copious evidence. There are really only two ways that a vehicle like this can accelerate. One is the obvious, pressing on the accelerator pedal on the floor. We looked at the accelerator pedal sensors. There are sensors on that device. We looked at what's called the ECM or power train control module, which is the brains, kind of the onboard computer of the vehicle. We also looked at something called the throttle position sensors on the throttle. However, this car had a distinct fault and a distinct defect. It showed that when we downloaded the data, and this was after years of contested litigation, and we had to get a court order to download the data from a second module, which is referred to as the power train control module or ECM. That data showed there was at least six historical diagnostic codes that showed that the cruise control was faulty. Through additional analysis, once we got that data, and the defendants also confirmed this, it was actually the acceleration resume switch, which is only the second allowable way that that car can accelerate. It can accelerate through the gas pedal, and it can also accelerate through the switch on your steering wheel. If any of you have ever set your cruise and then decided when you went from one road to a road with a higher speed limit, you can actually increase your speed. We believe that there was something wrong with that electrical signal that's sent to the car's computer that then raised the throttle. Is this what you were calling crosstalk, something to that effect? Our experts looked at a number of problems. Crosstalk is kind of a general term. It's not necessarily a scientific term, but it's when basically the signal wires get crossed. Is that what the theory was as to why there was a defect? Yes. This electronic flow, the electrical signals that go through where the cruise control is, also the radio and other signals, go through what's called a clock spring, which is a very kind of simple plastic mechanism where the wires all come to one juncture. The problem I see with your relying on that theory is that your experts who advanced that theory were excluded, and you haven't appealed that. Right. So you didn't have any expert to testify, so how can we say the district court didn't correctly grant summary given that you didn't have any expert testimony to support your theory of defect? Well, Judge Bush, I think we do have an expert. We have Stephen Loudon, who is a 30-year experienced electrical engineer and has experience with all sorts of componentry, including the electronic throttle control. He specifically said trying to replicate this sort of defect is very challenging. The car is severely damaged, and showing the electrical defect, just like if the lights flickered in this room, to get it to redo the exact same problem is actually pretty challenging. But didn't you state in your opposition to the motion to exclude that Loudon, quote, was not tasked with replicating a defect? His purpose was not to replicate a malfunction. That's right. So how can you now be arguing before us that that was his task, given that you represented to the district court that it was not his task? So to clarify, Judge Bush, and this is an excellent question, we are not asking Mr. Loudon, and Mr. Loudon didn't replicate a defect. He didn't inject faulty signals or try to put additional electronic magnetic interference to basically scramble the lights. He didn't do that. What he did do was take a 2008 Kia Optima Exemplar, and he took it on a closed track, and he looked at the different forms of acceleration through the gas pedal, which is what the defendants were saying, that it's basically a pedal-to-the-metal, wide-open throttle condition. And he found that the RPM shot way too high, and that it accelerated too fast compared to the facts in our case. In our case, we have over a half a mile, about six-tenths of a mile. What he did show is when he showed an allowable, instead of injecting a fault and trying to replicate a defect, he actually showed it was allowable through those signals, that the car would then accelerate from, say, 25 to 30 miles an hour, this is a 30-mile-an-hour zone, up to 92 miles an hour. And what was stunning is when he did that, and we had it all on camera, and we showed that, of course, during depositions and during this entire process, was that the car reached exactly 92 miles an hour and 4,300 RPM, which is exactly what the federal government, NHTSA, found was basically the snapshot on this car, which was the speedometer was frozen at 92 miles an hour, and the tachometer was frozen at 4,300 RPM. When he attempted to duplicate what the defendants believe happened in this case, it didn't work. The math didn't work. It either must have had to have been a much shorter incident, or she would have had to have kind of been feathering on the pedal, which also doesn't make a whole lot of sense. It would have had to match that. Why doesn't it, given that the National Transportation Highway Safety Administration found that there was no evidence of any braking, wouldn't it make sense that she was feathering the pedal, the acceleration pedal, thinking it was the brake? So feathering the pedal creates a real problem with getting up to that speed as well as the RPMs. But I want to be clear that the National Highway Traffic Safety Administration's report was over a year before we actually got the diagnostic trouble codes from the engine control module. So they've never even seen... They didn't have any evidence that she actually applied the brake at any point. Tyler Kress's testimony is probably the best example. It's totally practical that within, say, a 30 to 38-second incident, which is what we believe the duration of this incident would, that a person would try to apply the brake. She might have attempted, and it was not, you know, at 83 years old, she was not able to put enough force to fight, basically, a roaring engine at 4,300 RPM. She might have been attempting to stop at some point on the accelerator pedal to get, you know, thinking it might be stuck, physically stuck. Wouldn't that be consistent with feathering the acceleration? Well, one of the reasons we don't think the engine is feathering is that witnesses and the passenger in the car heard the car roaring consistently. And if you accelerate a car through the cruise control, for the first 5 or 10 seconds or so, the acceleration is actually relatively mild. You start building up speed, but after about 10 or 15 seconds, in this case, again, we think it lasted at least 30 seconds, the engine starts to really roar and the amount of acceleration, the amount of force. And you asked about feathering as well, Judge Bush. In this incident, the videotape shows the car in the last few seconds and the rate of acceleration was found by our experts to be closer to matching that of an acceleration through the cruise control rather than through the pedal. Just to recap what you're saying and make sure I'm correctly following, your central argument is that what Mr. Lowness, the expert, did was he took the characteristics of a cruise control-induced acceleration for that vehicle and compared it with the characteristics of a pedal-induced acceleration with that same vehicle and took into account the facts of Mrs. Park's accident and determined as an expert that the accident was consistent with cruise control-induced acceleration but not human-induced, pedal-induced acceleration. Is that what we're to take from the expert testimony in your theory of the case? Yes, that's what Mr. Lowden conducted and that's what we are to take from it. And again, Judge Bush, about the feathering of the pedals, if you take these two things, and this is the genuine material facts in dispute, our expert says that this sort of launch, if you will, is much more consistent with that and Judge Clay, you quoted it much better than I can up here at the podium. Well, I was quoting from your material. That's probably why it's good. But Judge Clay, I think you're right on point that he was simulating what the two theories were and which one was more likely based on all the data. And one of the reasons that this data is so important in this type of case, these sort of electrical malfunctions don't necessarily leave a footprint. This car was severely damaged. You couldn't go back and try to test the vehicle in any sort of driving mode, if you will. And finding that electrical signal at the fact, again, is not reasonable, not practical, because electrical signals, these things happen intermittently and randomly. They're not something that exists after. They can be kind of measured with some sort of device. And I believe I've exceeded my time, so I'll save my additional comments, if you will, for rebuttal. Thank you. Thank you. From opposing counsel. May it please the court. My name is Christopher Spencer, and I represent the Applease counsel. Respectfully, I think that my learned friend just conceded away his case. He admitted that he had to prove a defect. He admitted that crosstalk, or electromagnetic interference, is his alleged defect. And he admitted that his experts that espoused that theory were excluded, and he did not appeal. And in our view, that's dispositive of the entire matter. Well, no, that's not what he said. He said he wasn't relying on the excluded experts, and he's relying on the other expert, Mr. Loudon. That's what he said. As was pointed out earlier, Judge Clay, he told the district court that he was not relying upon Loudon to prove the existence of a defect. Rather, he was relying upon Loudon to demonstrate what could have happened had there been a defect. Isn't the issue now whether Mr. Loudon's testimony, whatever vote he has intended to use to begin with, isn't the issue now whether his testimony gets this case to the jury? I believe it is in part, and I'm qualifying for this reason, there was a pending motion to exclude Loudon altogether, which the district court never addressed because it didn't have to because of the plaintiff's concession. We're reviewing a record that considers Mr. Loudon's testimony, right? Yes, and finds that it did not prove proximate cause. It proved neither the existence of a defect nor proximate cause. And that point's very clear. It's very important because Judge Mattis really emphasized the proximate cause factor. Mr. Loudon did not, in his demonstration, duplicate the defect. Rather, he got him in an exemplar vehicle and he turned the cruise control on, which he admitted that. . . The car's all crashed up, so there would be a physical impossibility. All an expert could do is run test modules based on what likely would have occurred or when the expert's opinion did occur based on the factual circumstances. I just think you're just overstating everything. I mean, when you overstate everything like this, it sort of detracts from your argument instead of enhances it. Your Honor, I certainly don't mean to overstate, and I hope I haven't come across that way. Evidently, I have. But to your point, what could he have done? He could have done exactly what the defense expert did in Document 317-8 from the record. And our expert at page ID 10-335 showed exactly what you would have to do to replicate the defect. He demonstrated that. Well, can you ask the judge the way and decide which expert to believe at this point? That's not our role. Let me ask you this question. It strikes me that Mr. Wilder's testimony, you probably do have to have an expert to get this case to the jury. But it's bolstered by considerable proof from lay witnesses who observed what was going on during the time immediately before this accident and upon the occasion of the accident. Not only evidence from the driver of the car, but other witnesses as well. So it would seem to me that combining the expert report with all of that proof, I don't see how this case could not win for the jury. Well, Your Honor, there is one key piece. There are many pieces of evidence that explain why Loudon's analysis is of no consequence. But the key one is that there is no eyewitness testimony and no testimony of any kind that Mrs. Parks ever turned on the cruise control. And everybody admits that the only way in which the cruise control could have caused the vehicle to accelerate is if she had turned it on. And there's no such evidence. Does she have to have direct evidence that she turned it on? Or does what happened to the car permit an inference that, in fact, whether intentionally or inadvertently, she activated the cruise control? It does not allow the inference because the inference is too much of a stretch. The plaintiffs have to eliminate, with circumstantial evidence, they have to eliminate all reasonably likely causes. That's Blackwater, Tennessee law. If what happened appears to be entirely consistent with what Mr. Loudon says likely happened, it appears that maybe you can skip the step of having somebody say she turned on the cruise control. Well, the only way the cruise control becomes a factor is if it turns on. And Mr. Loudon himself deliberately turned on the cruise control. Well, the cruise control, if it's defective, it might simultaneously come on of its own behest. We don't know if it's defective and circumstances indicate that it could have been. We don't know if it was turned on by the driver or came on inappropriately on its own. In fact, Mr. Loudon ruled that out, Judge Clay. Mr. Loudon testified that the cruise control had to be turned on. But you said Mr. Loudon's testimony had to be completely disregarded. You can't really now rely upon his testimony, can you? Well, in part because it has to be disregarded in part because he ruled out the very hypothetical that you just prescribed. In fact, he further testified he had no evidence and no reason to believe there was any reason why Mrs. Parks would ever have turned on. But you said Mr. Loudon didn't know what he was talking about. Now you're using his opinions to bolster your argument. Well, I think Mr. Loudon knew exactly what he was talking about. What I said is that Mr. Loudon's test did not replicate the defect. What Mr. Loudon did was get in the vehicle and he actually feathered, first he set the cruise control to 92 miles per hour on one run. And then on the following run, he hit resume speed. And he found that the vehicle, in fact, went back up to 92 miles an hour. The other thing that he did in his experiments was he feathered the cruise control in an effort to match the 92 miles per hour, 4300 RPMs. So all Mr. Loudon has demonstrated is that he is skillful at manipulating a properly functioning cruise control. That's all he's proved. He has made an opinion that the facts of the event here fit the characteristics of a cruise control acceleration almost exactly. They do not remotely fit the characteristics of an acceleration caused by a driver applying force to the accelerating pedal. That was his ultimate conclusion. I believe that's the plaintiff's characterization of his conclusion and I believe it's not borne out by the record. You don't think that's accurate? You don't think that's an accurate summary of what Mr. Loudon said? I don't believe that it is. And furthermore, as Judge Mattis found in a very thorough 37-page opinion, Loudon's opinion presupposed the existence of a cruise control problem. The only way you could trace back to the defect is to have the defect and there's no proof of the defect. Yeah, and also I just went back to check. This was a posted speed limit of 30 miles per hour on this road. This was a commercial setting. I believe that's right. Not exactly where people normally use cruise controls. That's correct. Let me ask you something about the record. Mrs. Parks purportedly made some statement in the aftermath of the crash that would indicate that she had a runaway car on her hand that she couldn't control and of course she's now deceased so she can't be examined or cross-examined under the law of evidence because she was on her sort of metaphorically speaking on her death bed when she made the statement she made. Are those statements admissible under any exception to the hearsay rule? I think they are. I think it's a present sense impression. I think it's arguably a dying declaration. She was certainly in fear of her death. I believe those statements are properly part of the record and are properly things for the court to consider. But what she doesn't, all she established is the same thing that was established in the case of the gentleman that plowed into the farmer's market in Santa Monica that the National Transportation Safety Board investigated. He thought he was, he didn't think he was accelerating but in fact he was. Now we don't know, contrary to Jarvis upon which the plaintiffs place great reliance, we have no evidence that Ms. Park's foot was actually on the brake. In fact we have uncontradicted evidence that her foot was actually on the accelerator pedal at the time of the crash because that's the only way the pedal could have been trapped where it was. The National Highway Traffic Safety Administration also investigated the question of braking and found that there was no evidence of braking. And none of the witnesses that Judge Gibbons you referred to said they saw any brake lights. And contrary to the evidence that we have in other cases, there's no evidence of braking at all, none. So there's no evidence that she was ever on the brakes. The National Highway Traffic Safety Administration also looked at the question of whether she had turned the accelerator, the ignition switch to accessory or put the gear shift in neutral as they were both found. And NITSA found specifically there's no evidence that those things weren't put there by the first responder. When you say there was no evidence that she had her foot on the brake, we know what your conclusions in that regard are because you just stated them. But what evidence are you referring to aside from the fact that eyewitnesses did notice brake lights? All of the evidence and specifically the video to which my friend referred. You can see the taillights of the vehicle in the video from the last seconds, the last several hundred feet of impact. The brake lights are clearly not on. The brake lamp filaments were clearly not bent and they would have been bent because they would have been heated and they would have been deformed given the severity of the crash. In addition, if the cruise control had been in operation, everyone agrees that application of the brakes disables the cruise control immediately. When you put your foot on the brakes, the cruise control is disabled. Everybody agrees with that. Well, if it's working properly, certainly. But was the vehicle, it was a horrible crash. Was the vehicle conditioned that the brake lights and all of that could have been tested subsequent to the crash? Yes, and they were by all the experts including Mr. Kress. And I want to remind you of what Mr. Murray said when he was asked the question by Judge Bush, I believe, is there any evidence that she applied the brake? And he didn't identify any. What he said instead, and I wrote it down, was that his experts surmised that given the length of time, she would have applied the brake. So Mr. Murray himself has admitted there is no evidence in this record of actual brake application. Well, he didn't admit that she didn't apply the brake. He didn't come right out and say that. You're exactly right, Judge Clay. But by declining to or being unable to provide specific evidence in response to Judge Bush's question, he said essentially the same thing, we would suggest. That's our view. So the fact of the matter is that this National Highway Traffic Safety Administration report found that there was no evidence. It specifically says there's no evidence of pre-crash braking. What deference, do we give any deference to this, or what's the significance of this report? It's part of the record, and I believe it must be viewed with all of the other evidence. And there is no evidence in this record of actual pre-crash braking, none. On the contrary, there is evidence that she was on the accelerator pedal because that's the only way it could have been trapped in the position in which it was found. And Judge Mattis said there's no genuine dispute or material fact on that. So I think that respectfully, Loudon doesn't get them there for the reasons that I stated. But even if in some way, shape, or form, Loudon's opinion could be considered, then the remedy is to look at the motion to exclude Loudon and have that be one. We can't rule on that. No, you can't. You can't. Because it wasn't briefed, you're right. But I'm answering Judge Gibbons' question. She said, doesn't this create a genuine dispute of material fact for the jury? And I'm saying, no, we have this other step there. I was addressing Judge Gibbons' question in that regard. If there are no further questions, you have my argument. Thank you very much. Any rebuttal? Counsel, you may proceed. Thank you, Your Honors. In rebuttal, the appellants would like to share a number of things to contradict the opinion of the Kia defendants. First of all, I just want to clarify that the plaintiffs obtained four very qualified long-time auto safety experts in this case. In addition, we also sought counsel from over a dozen other consultants and experts, including folks in Seoul, South Korea, who actually investigated sudden unintended acceleration problems due to vaulted issues in Hyundai and Kia vehicles. Secondly, I want to reiterate what Judge Gibbons brought up about the lay witnesses. There are at least a half a dozen lay witnesses, EMT providers, firemen, as well as folks that came to the scene. Almost every single one of them who came across Mrs. Parks that day, she said, there's something wrong with this car. It's like it had a mind of its own. I couldn't control it. I couldn't stop it, no matter what I did. So it's very important. Mr. Spencer also said something that I'd like to clarify. He said perhaps the key was turned to the accessory position and that the actual shifter was put in neutral, and that might have been done by the EMTs. We have deposed everyone in this case, and not a single person from either the EMTs, the fire department, the police, said that they touched that part of the vehicle. In fact, a custom protocol, if you will, their protocols would be to leave that alone in any sort of incident like this. So we believe Mrs. Parks did take affirmative action. That should be an implication that she also did things like trying to touch the brakes at some point. She may have given up. She may have put her legs somewhere to brace for the collision. We don't know. Was there any expert testimony from your side as to whether or not applying the brake would deactivate cruise control? That's an excellent question. I'm glad Mr. Spencer brought this up. The cruise control is deactivated by something called a stop lamp switch. Ironically, and it's in the record, there's actually a technical safety bulletin, a TSB, that says these vehicles need to have that switch replaced because they were finding that there was erratic voltage signals with that. So it could have been that the brakes were touched and that that did not happen. So I wanted to make sure that that is very clear. But I want to make sure that we understand that these are lay witnesses that watched this car go by, talked to Mrs. Parks. She was also in the car, and Mrs. Duncan may talk more to this, but Plaintiff Jimmy Ruth Northcutt, her sister was in the car and heard her say, there's something wrong with this car. I can't stop it. It's like it had a mind of its own. So that certainly is a present-sense impression, talking to your point, Judge Clay. And we also think it was a dying declaration and an excited utterance when the EMTs arrived. Your opposing counsel is arguing that none of the witnesses saw the vehicle with brake lights being on. What do you say to that? So ironically, there's the video of the actual case, and it's hard to see the brake lights of the cars that we know are slowing down and braking at the intersection. This is at daylight. It was actually a pretty sunny day for New Year's Eve in Winchester, Tennessee. And so it was a bright day, late morning. It was actually very difficult to see. So I would contend that there is still some issues and dispute about what the video shows. It's kind of a lower-quality video. It's a security camera, I think, next to a florist or a shop that was near the intersection. In addition, Dr. Kress, one of our experts who has not been, he was mooted, but he was not daubered out of this case. He did look at the filament light bulbs, and he does have different opinions regarding the filaments and how it could show braking. Some of them were kind of darkened, and the filaments were actually curved. They were not broken. But you make a great point, Judge Clay. It's very difficult to look at a vehicle that's had a collision at almost 100 miles an hour and has basically been demolished and say these things indicate. It's very difficult. This car did not have what's called an event data recorder, which modern cars do have. Again, it was implemented by the federal government and the Department of Transportation due to the fact of unintended acceleration in American vehicles, particularly the Toyota crisis. I also wanted to talk a little bit about, Judge Gibbons, that these are issues that must go before a jury. It's undisputed that the Browder decision by the Tennessee Supreme Court clearly says that if reasonable minds might differ on these issues, that a case must go to a jury. Not might or can, but must go to a jury. Therefore, this case should be remanded. These decisions should be reversed. It should be remanded to the trial court for resolution of these issues by a jury. I don't want to get into some of the things that our counsel in the Parks case will talk about in respect to what Mr. Bush said, but there is a huge difference in opinion between Dr. Kress and Mr. Loudon and the defendant's experts about where the pedal is placed in the board. We did electrical measurements. In fact, Dr. Choi from South Korea was at that inspection. It's undisputed that it showed that it's actually in a neutral position, not a depressed position. The way that the pedal is impressed could be from the actual crash itself. It could be deformed into the floor from the crash itself. Her leg could have come from the left and pushed it because it's not straight down to the floor. It's actually quite a bit to the right. I want to share that these come up with unintended acceleration. I should share that our firms handled dozens of these cases. There's no comment from the defense that it was something like a floor mat or any physical entrapment. There are two theories of this case. The defense, where she put her pedal to the metal and left her foot on the pedal for almost 30 seconds, over six-tenths of a mile, again, eight football fields, and basically intentionally crashed into an intersection. She had a spotless driving record. She was in good health for a woman of her age. This was her car for over seven years. She was very familiar. You might want to wind up. I apologize. With that, we just ask for this court to consider, again, reversing this decision, remanding this case back to the district court based on the Browder case in the Tennessee Supreme Court. We're thankful for your time. On behalf of Aaron and Lynetta Hill and their extended family, we appreciate your time and consideration in this case. Thank you. Thank you. Thank you. This case will be submitted, and the next case may be called pertaining to the same.